IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                 Plaintiff,

vs.

MANSSOR ARBABSIAR,

             Defendant.

Case No.  S1 11 Cr. 897 (JFK)

PLAINTIFF'S MOTION PURSUANT TO 28 U.S.C. §2255 IN CHALLENGING THE BASE AND FINAL GUIDELINES APPLICATIONS BY THE COURT AS APPLIED

Comes now the Defendant MANSSOR ARBABSIAR, in pro se, with his above captioned motion and in so doing avers the following in support thereof:

<u>BACKGROUND</u>

APR 2 8 2014

PRO SE

On October 16, 2012 the Defendant entered into a plea agreement with the assistance of counsel with the Office of the United States Attorney in the Southern District of New York.  See EXHIBIT#1.  As part of said plea the Defendant agreed to plead guilty to counts One, Two, and Three.  The Defendant was given all of one day to make a decision as to whether he would accept the offer as contained in the plea agreement.  EXHIBIT#1.  On May 01, 2013, Defendant's counsel, David E. Patton, filed the "Defendant's Sentencing Memorandum on behalf of Mr. Manssor Arbabsiar."  The thrust of the sentencing memoradum filed by counsel identifies a mental disorder that was "longstanding, untreated bipolar disorder."  Said memorandum went on to articulate that the

condition worsened at the death of his father.  Counsel articulated

that the offense conduct,engaged in by the Defendant,was the result

of a "severe mental breakdown"and was "aberrational, with no precedent

in his life."  At no point in the sentencing process has the Court

undertaken an analysis of the offense conduct as being driven-on by

the mental disorder[s] of the Defendant.

On May 03, 2013, the Defendant's counsel filed a "Reply Sentencing

Memorandum" which categorically outlines the chronological sequence of

events that put into motion the irrational offense conduct engaged in

by the Defendant.  The Defense countered the opposition of the govern-

ment's argument that the Defendant was found by only one doctor to suffer

from a severe mental illness.  Counsel pointed-up that the Defendant

was examined by Dr. Michael First, Doctor Joel Morgan, and a report by

Dr. Chin.  In sum, the report by Dr. Chin and the other attendant

physicians are outlined in EXHIBIT#2.  Never at anytime has the Court

undertaken a hearing to determine, clinically, the altered state-of-

mind of the Defendant at the time he was involved in the criminal

circumstances charged by indictment in this Court.


LEGAL ARGUMENT AND DISCUSSION


The Defendant's physician Dr. First was called to the stand to

testify to the altered state of the Defendant's mental faculties.  Dr.

First administered what's known as a "SCID" evaluation of the Defendant.

In the end Dr. First concluded that the Defendant suffers from bipolar

II disorder.  The diagnosis of bipolar II disorder is reccounted by

way of EXHIBIT#3(page-27)(lines: 1-16).  In fact the Court inquired of

the state-of-mind of the Defendant in regard to the professional opinion
of Dr. First.  See EXHIBIT#3(page-27)(lines: 17-25).  The Court was
having trouble understanding the testimony of Dr. First on a forensic
level as to what exactly the Doctor was testifying to in regard to the
mental condition on the Defendant.  See EXHIBIT#3(page-28)(lines: 1-25).
Between Defendant Counsel and the Court admonishing Dr. First to "slow
down" in his testimony. Dr. First did his best to acquaint the Court
with the unique circumstances of the mental disease of the Defendant.
See EXHIBIT#3(page-29)(lines: 1-25).  The Court goes on to basically
refute the facts as testified to by the doctor without any information
of conclusive rebuttal testimony as to the mental state of the Defen-
dant.

The Court then went on to calculate the base offense level for
the Defendant.  The plea to which the Defendant signed and understood
does not reflect the in court plea colloquy that was engaged in with
the judge at the time of the change of plea hearing.  First, the Def-
endant did not agree to any facts contained in the plea agreement
that he participated in a conspiracy or solicitation to commit murder.
His base offense level was thereby improperly calculated at 33.

Second.  The Defendant never admitted to any conduct in receiving
something of precuniary value for undertaking the murder.  A (4) level
increase was assessed based on said conduct.  Third.  the Defendant
did not.admit to any terroristic acts that would increase his levels
by (12) on the sentencing scale.  Based on the erroneous calculation
of Count-One, the Defendant was assessed a level of (49).  Fourth.
The Defendant did not admit to conduct contained in Count-3 which
charges an offense against the United States.  The Court has also
wrongly concluded that Defendant did not deserve a decrease by (3)

level for his "acceptance of responsibility" because he was alleged
to be a co-conspirator in the crimes charged in Counts One, Two, and
Three.  The Defendnat has a Constitutional Right to effective assis-
tance of counsel at sentencing.  See Strickland v. Washington, 466 U.S.
@689(1984).  The counsel who handled the Defendant's sentencing hearing
assistance "fell well below the objective standard of reasonableness."
Id.  "But for the deficiency, the outcome of the proceeding would be
different."  See McKee v. United States, 167 F.3d 103, 106 (2nd Cir.
1999).  Counsel should have insisted on a proper application of the
guideline range before inducing the Defendant into signing a plea
that waived his rights to appeal any collateral issues or on direct
appeal.  This conduct is further exascerbated by the fact that counsel
knew of the Defendant's mental frailties and his ability to comprehend
what was happening to him.  The Defendant was given all of (1) day to
"make up his mind" whether he wanted to take the plea in question or
not.  There's no question that the guideline range that was agreed to
by the Defendant, his counsel, and the prosecution is erroneously
calculated in the first instance.  In sentecing a Defendant, a court
must engage in a (3) step process pursuant to Gall v. United States,
552 U.S. 38 (2007).  First, it must properly caluclate the advisory
guideline range.  Second, the court must formely rule on any motion
for departure and state the opposton, if any, of such ruling on the
guidelibe calculations. Id.  Third, the court is required to exercise
its discretion and consult the sentencing factors set forth in 18 U.S.C.
§3553(a), which may vary from the applicable guidline range.  Id.  See
Also Myton v. United States, 2013 U.S. Dist. LEXIS 13289.  In this
matter the Defendant was not afforded "as applied" a challenge to the

-4-

court's fact-finding. <u>Id</u>. The starting point and initial benchmark is the district court's requirement to properly calculate and consider the applicable guideline range. This fact was not excised by the amendment to the Sentencing Guidelinees by the Supreme Court in United States v. Booker. As such, the Defendant cannot waive the improper calculation of the applicable sentencing guidelines or the fact that he was provided ineffective assistance of counsel in the negotiation of the plea and waiver. For the reasons contained in the Defendant Motion to correct his sentence under 28 U.S.C. §2255 in this matter, the Defendant prays for a resentencing on this matter with consideration for the application of the proper base offense and final offense level as well as a downward departure based upon his state of mental health at the time of the commission of the instant offense which was not factored into the sentencing of the Defendant by the Court. The Defendant also moves this Court to assign him new counsel to undetake his re-sentencing objectives.


Dated:   April 19, 2014                    Respectfully submitted,

                                           _Manr alolri_

                                           Manssor Arbabsiar

                                           Defendant/IN PRO SE
                                           Address:  #65807-054
                                           P.O. Box 1000 U.S.P
                                           Marion, IL.  62959


                        CERTIFICATE OF SERVICE

     I, the undersigned, hereby place my MOTION PURSUANT TO §2255 in
the "prison mailbox" for delivery in the U.S. Mail, postage prepaid,
by First Class Mail to all parties this 19th day of April, 2014.

s/ _Mow ahdri_
MANSSOR ARBABSIAR



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 16, 2012

**BY E-MAIL**

Sabrina Shroff, Esq.
Federal Defenders of New York
52 Duane Street, 10th Floor
New York, New York 10007

    Re:    <u>United States</u> v. <u>Manssor Arbabsiar</u>
               S1 11 Cr. 897 (JFK)

Dear Ms. Shroff:

       On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Manssor Arbabsiar ("the defendant") to Counts One, Two, and Three of the above-referenced Superseding Information (the "Information").

       Count One of the Information charges the defendant with traveling in foreign commerce and using interstate and foreign commerce facilities in the commission of murder-for-hire, from at least in or about the spring of 2011, up to and including on or about September 29, 2011, in violation of Title 18, United States Code, Section 1958.  Count One carries a maximum term of imprisonment of ten years; a maximum fine of the greatest of $250,000 or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant as a result of the offense; a $100 special assessment; and a maximum term of three years' supervised release.

       Count Two of the Information charges the defendant with conspiring to travel in foreign commerce and to use or cause another to use interstate and foreign commerce facilities in the commission of murder-for-hire, from at least in or about the spring of 2011, up to and including on or about September 29, 2011, in violation of Title 18, United States Code, Section 1958.  Count One carries a maximum term of imprisonment of ten years; a maximum fine of the greatest of $250,000 or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant as a result of the offense; a $100 special assessment; and a maximum term of three years' supervised release.

       Count Three of the Information charges the defendant with conspiring to commit an offense against the United States, namely, an act of terrorism transcending national boundaries,

Sabrina Shroff
October 16, 2012
Page 2

in violation of Title 18, United States Code, Section 2332b, in violation of Title 18, United States Code, Section 371, from at least in or about the spring of 2011, up to and including on or about September 29, 2011. Count Three carries a maximum term of imprisonment of five years; a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; a $100 special assessment; and a maximum term of three years' supervised release.

The total maximum term of imprisonment on Counts One through Three is twenty-five years.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations as to which this Office cannot, and does not, make any agreement) for: (i) his participation in a conspiracy to murder a foreign official, from at least in or about the spring of 2011, up to and including September 29, 2011, in violation of Title 18, United States Code, Section 1117, as charged in Count One of Indictment 11 Cr. 897 (JFK); (ii) engaging in foreign travel and using interstate and foreign commerce facilities in the commission of murder-for-hire, from at least in or about the spring of 2011, up to and including September 29, 2011, in violation of Title 18, United States Code, Section 1958, as charged in Count Two of Indictment 11 Cr. 897 (JFK); (iii) his participation in a conspiracy to engage in foreign travel and the use of interstate and foreign commerce facilities in the commission of murder-for-hire, from at least in or about the spring of 2011, up to and including September 29, 2011, in violation of Title 18, United States Code, Section 1958, as charged in Count Three of Indictment 11 Cr. 897 (JFK); (iv) his participation in a conspiracy to use a weapon of mass destruction, from at least in or about the spring of 2011, up to and including September 29, 2011, in violation of Title 18, United States Code, Section 2332a, as charged in Count Four of Indictment 11 Cr. 897 (JFK); and (v) his participation in a conspiracy to commit an act of terrorism transcending national boundaries, from at least in or about the spring of 2011, up to and including September 29, 2011, in violation of Title 18, United States Code, Section 2332b, as charged in Count Five of Indictment 11 Cr. 897 (JFK); it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq. In addition, at the time of sentencing, the Government will move to dismiss any open Counts against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

The defendant hereby admits the forfeiture allegation with respect to Counts One and Two of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the

03.30.2012

Sabrina Shroff
October 16, 2012
Page 3

offenses. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

**A. Offense Level**

1. Pursuant to U.S.S.G. § 3D1.2(b), Counts One, Two and Three are grouped together into a single group because the counts involve the same victim and two or more acts or transactions are connected by a common criminal objective.

2. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is the offense level for the most serious of the counts comprising the group.

**Count One – Murder-For-Hire**

3. Pursuant to U.S.S.G. § 2E1.4(a)(2), the applicable base offense level is 33 because U.S.S.G. § 2A1.5 provides the base offense level applicable to the underlying criminal conduct; *i.e.*, conspiracy or solicitation to commit murder.

4. Pursuant to U.S.S.G. § 2A1.5(b)(1), the offense level is increased by 4 levels because the offense involved the offer or receipt of something of pecuniary value for undertaking the murder.

5. Pursuant to U.S.S.G. § 3A1.4, because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the offense level is increased by 12 levels.

6. In accordance with the above analysis, the applicable Guidelines offense level for Count One is 49.

**Count Two – Conspiracy to Commit Murder-For-Hire**

7. Pursuant to U.S.S.G. § 2E1.4(a)(2), the applicable base offense level is 33 because U.S.S.G. § 2A1.5 provides the base offense level applicable to the underlying criminal conduct; *i.e.*, conspiracy or solicitation to commit murder.

8. Pursuant to U.S.S.G. § 2A1.5(b)(1), the offense level is increased by 4 levels because the offense involved the offer or receipt of something of pecuniary value for undertaking the murder.

Sabrina Shroff
October 16, 2012
Page 4

9.  Pursuant to U.S.S.G. § 3A1.4, because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the offense level is increased by 12 levels.

10. In accordance with the above analysis, the applicable Guidelines offense level for Count Two is 49.

### Count Three – Conspiracy to Commit an Offense Against the United States

11. Pursuant to U.S.S.G. § 2X1.1, the base offense level is the base offense level for the substantive offense, *i.e.*, the commission of an act of terrorism transcending national boundaries. Pursuant to U.S.S.G. § 2X1.1(b)(2), a decrease by 3 levels is not warranted because the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense.

12. The Guideline applicable to the substantive offense is U.S.S.G. § 2A1.1(a). Pursuant to U.S.S.G. § 2A1.1(a), the base offense level is 43.

13. Pursuant to U.S.S.G. § 3A1.4, because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, the offense level is increased by 12 levels.

14. In accordance with the above analysis, the applicable Guidelines offense level for Count Three is 55.

15. Accordingly, pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is 55.

16. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to § 3E1.1(a), U.S.S.G. Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional one-level reduction is warranted, pursuant to § 3E1.1(b), U.S.S.G. because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 52.

03.30.2012

Sabrina Shroff
October 16, 2012
Page 5

## B. Criminal History Category

Pursuant to U.S.S.G. § 3A1.4, the defendant is in Criminal History Category VI.

## C. Sentencing Range

Based upon the calculations set forth above, the applicable Guidelines range is life imprisonment. However, because the total statutory maximum sentence permitted by the charges in Counts One through Three is twenty-five years' imprisonment, the applicable Guidelines sentence is 300 months (the "Stipulated Guidelines Sentence"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 52, the applicable fine range is $25,000 to $250,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Sentence set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party suggest that the Probation Office consider such a departure or adjustment under the Guidelines, or suggest that the Court *sua sponte* consider any such departure or adjustment.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Sentence, suggest that the Probation Office consider a sentence outside of the Stipulated Guidelines Sentence, and suggest that the Court *sua sponte* consider a sentence outside of the Stipulated Guidelines Sentence, based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding the Stipulated Guidelines Sentence (or where within such other range as the Court may determine the defendant should be sentenced) and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the

Sabrina Shroff
October 16, 2012
Page 6

Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the Stipulated Guidelines Sentence, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines sentence set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence at or below the Stipulated Guidelines Sentence of 300 months' imprisonment, and (ii) that the Government will not appeal any sentence at the Stipulated Guidelines Sentence. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal any fine that is less than or equal to $250,000, and the Government agrees not to appeal any fine that is greater than or equal to $25,000.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. The defendant admits that the facts set forth below and in Exhibit A are true, and were this case to go to trial, the United States would be able to prove these specific facts and others beyond a reasonable doubt. Further, the defendant agrees to allocute at the guilty plea proceeding to the facts set forth below and in Exhibit A.

Sabrina Shroff
October 16, 2012
Page 7

> From the Spring of 2011 through the Fall of 2011, Manssor Arbabsiar and
> his co-conspirators, officials in the Iranian military who were based in Iran
> (the "co-conspirators"), agreed to cause the assassination of the
> Ambassador of Saudi Arabia to the United States (the "Ambassador"),
> while the Ambassador was in the United States.
>
> Acting at the direction of his co-conspirators and in furtherance of this
> agreement, Arbabsiar traveled internationally to Mexico on several
> occasions, including from Iran, in order to arrange the assassination of the
> Ambassador. These trips occurred in May, June, July and September of
> 2011. In Mexico, Arbabsiar met with a person ("the Individual") who
> claimed to be a representative of a sophisticated and violent Latin
> American drug cartel that had access to military-grade weaponry. With
> the approval of Arbabsiar's co-conspirators, Arbabsiar arranged to hire the
> Individual and his criminal associates to murder the Ambassador, while
> the Ambassador was in the United States. Arbabsiar agreed to pay $1.5
> million to the Individual.
>
> Arbabsiar discussed with the Individual a plan for the Individual and his
> criminal associates to travel to Washington, D.C. to murder the
> Ambassador at a restaurant there. The plan was subsequently approved by
> Arbabsiar's co-conspirators.
>
> Arbabsiar then arranged for a $100,000 payment, in two installments, to
> be wired to the Individual at a U.S. bank account, as a down-payment for
> the anticipated murder of the Ambassador. Arbabsiar's co-conspirators
> approved this payment, which was made via wire transfers to a U.S. bank
> account that passed through Manhattan, New York.

By entering this plea of guilty, the defendant waives any and all right to withdraw his
plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the
Government has failed to produce any discovery material, Jencks Act material, exculpatory
material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), other than information establishing
the factual innocence of the defendant, and impeachment material pursuant to *Giglio* v. *United
States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of
this Agreement.

It is further agreed that should the conviction following the defendant's plea of guilty
pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-
barred by the applicable statute of limitations on the date of the signing of this agreement
(including any counts that the Government has agreed to dismiss at sentencing pursuant to this

Sabrina Shroff
October 16, 2012
Page 8

Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution.  It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

03.30.2012

Sabrina Shroff
October 16, 2012
Page 9

Apart from any written Proffer Agreement that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

PREET BHARARA
United States Attorney

By: _____
Edward Y. Kim
Glen A. Kopp
Stephen J. Ritchin
Assistant United States Attorneys
(212) 637-2401 / 2210
(914) 993-1947

APPROVED:

_____
Michael Farbiarz / Jocelyn Strauber
Chiefs
Terrorism and International Narcotics Unit

AGREED AND CONSENTED TO:

_____
Manssor Arbabsiar

_____   10 / 17 / 12
Date

APPROVED:

_____
Sabrina Shroff, Esq.
Attorney for Manssor Arbabsiar

_____   10 / 17 / 12
Date

03.30.2012

**Exhibit A**

From the Spring of 2011 through the Fall of 2011, Manssor Arbabsiar and his co-conspirators, officials in the Iranian military who were based in Iran (the "co-conspirators"), agreed to cause the assassination of the Ambassador of Saudi Arabia to the United States (the "Ambassador"), while the Ambassador was in the United States.

Acting at the direction of his co-conspirators and in furtherance of this agreement, Arbabsiar traveled internationally to Mexico on several occasions, including from Iran, in order to arrange the assassination of the Ambassador. These trips occurred in May, June, July and September of 2011. In Mexico, Arbabsiar met with a person ("the Individual") who claimed to be a representative of a sophisticated and violent Latin American drug cartel that had access to military-grade weaponry. With the approval of Arbabsiar's co-conspirators, Arbabsiar arranged to hire the Individual and his criminal associates to murder the Ambassador, while the Ambassador was in the United States. Arbabsiar agreed to pay $1.5 million to the Individual.

Arbabsiar discussed with the Individual a plan for the Individual and his criminal associates to travel to Washington, D.C. to murder the Ambassador at a restaurant there. The plan was subsequently approved by Arbabsiar's co-conspirators.

Arbabsiar then arranged for a $100,000 payment, in two installments, to be wired to the Individual at a U.S. bank account, as a down-payment for the anticipated murder of the Ambassador. Arbabsiar's co-conspirators approved this payment, which was made via wire transfers to a U.S. bank account that passed through Manhattan, New York.

*EXHIBIT #2*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                   :

UNITED STATES OF AMERICA,       :

                            :

     -against-               :

                            :

MANSSOR ARBABSIAR,        :    11 Cr. 897 (JFK)
GHOLAM SHAKURI,          :

                            :

                Defendants.  :

                            :
-----------------------------------X


### REPLY SENTENCING MEMORANDUM ON BEHALF OF MANSSOR ARBABSIAR


                           DAVID E. PATTON, ESQ.
                           Federal Defenders of New York, Inc.
                           52 Duane Street - 10th Floor
                           New York, New York 10007
                           Tel.: (212) 417-8700

                                Attorney for Defendant
                                MANSSOR ARBABSIAR

Sabrina P. Shroff, Esq.
Colleen P. Cassidy, Esq.
  Of Counsel

TO:  PREET BHARARA, ESQ.
     United States Attorney
     Southern District of New York
     One St. Andrew's Plaza
     New York, New York 10007
     Attn.:  Edward Kim, Esq.
             Glenn Kopp, Esq.
             Assistant United States Attorneys
             Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
                                 :
UNITED STATES OF AMERICA,        :
                                 :
        -against-                :
                                 :
MANSSOR ARBABSIAR,               :    11 Cr. 897 (JFK)
GHOLAM SHAKURI,                  :
                                 :
                                 :
              Defendants.  :
                                 :
---------------------------------X


<u>REPLY SENTENCING MEMORANDUM ON BEHALF OF MANSSOR ARBABSIAR</u>

In its opposition the government wrongly implies that Dr. Michael B. First is the only doctor to conclude that Mr. Arbabsiar suffers from mental illness (diagnosed by Dr. First as bipolar disorder). This is not true. Dr. First's diagnosis is supported by Mr. Arbabaisar's behavior, the statements of friends and family, the diagnostic tests of Dr. Joel Morgan, and the medical records from the Metropolitan Correctional Center ("MCC"), where Mr. Arbabsiar has been detained in isolation for the last two years.

Untrue is the government's contention that "the health care professionals who have seen the defendant regularly" at the MCC (Government sentencing submission at 17) have not observed Mr. Arbabsiar's mental problems.  Attached hereto is the March 14,

1

2013 report of Dr. Chin, a contract psychiatrist at the MCC. (Exhibit A). That report by Dr. Chin memorializes his observations of Mr. Arbabsiar's actions and loss of control, both of which are characteristic of bipolar disorder.

On March 14, 2013, Dr. Chin, an outside psychiatrist who consults with the health care providers at the MCC on a contractual basis, had to be called in for a consult with Mr. Arbabsiar. Dr. Chin's notes his observations of the patient Arbabsiar while he was on a continuous rant, speaking at a fast rate. Dr. Chin noted that Mr. Arbabsiar's mood shifted from anxious to dysphoric and angry. See, Exhibit A (Dr. Chin's medical records) and Letter dated May 3, 2013, from Dr. Michael B. First, attached hereto as Exhibit B.

In Exhibit A, Dr. Chin records that Mr. Arbabsiar's thinking was "circumstantial." Dr. First explains that "circumstantial" is a disturbed pattern of speech characterized by delay in getting to the point because of the interpolation of unnecessary details and irrelevant parenthetical remarks, all of which are characteristic of mental disorders such as bipolar disorder and schizophrenia. See, Exhibit B.

According to Dr. First, Dr. Chin's observations support Dr. First's prior findings as reflected in his April 16, 2013, Report(Exhibit A to Mr. Arbabsiar's Sentencing Memorandum,). In

2

his report of April 16, 2013, Dr. First noted that Mr. Arbabsiar displayed "frequent tangentiality" (First Report at page 11), a similar form of thought disorder which often co-occurs with circumstantiality and is also characteristic of bi-polar disorder.

Dr. Chin's medical response of March 14, 2013, to the symptoms displayed by the patient fully supports Dr. First's diagnosis. Dr. Chin prescribed Risperidone, which is officially approved by the FDA for both schizophrenia and bipolar disorder manic/mixed.  In his report, Dr. Chin added an additional psychiatric diagnosis, "other specified episodic mood disorder" to Mr. Arbabsiar's medical records. This is the first time that the MCC records reflect a diagnosis of a mood disorder in addition to the diagnoses of Generalized Anxiety Disorder. Dr. Chin's use of the "other specified episodic mood disorder" reflects his judgment that Mr. Arbabsiar was suffering from an episodic mood disorder but that there was insufficient information from this brief one-time evaluation to make a more specific mood disorder diagnosis.

In Dr. First's medical opinion, the March 14, 2013, episode as witnessed by Dr. Chin is notable for two reasons. Mr. Arbabsiar's presentation on March 14, 2013, as witnessed by Dr. Chin and documented in the chart as a mood disturbance that

3

would likely benefit from "mood stabilization", is typical of the kind of sub-threshold mixed hypomanic/depressive states that have characterized Mr. Arbabsiar's baseline mood disturbance in between the more severe depressive and hypomanic episodes outlined in the report, and that have been seen by his lawyers on various occasions during his incarceration. Thus, it provides additional validity for Dr. First's diagnosis.

Second, it demonstrates the reason that the MCC's medical diagnoses differ from Dr. First's original diagnosis of bipolar disorder.  MCC's diagnoses only reflect the psychiatric symptoms that were manifest during Mr. Arbabsiar's encounters with clinical staff at MCC. As noted in Dr. First's report, the course of bipolar disorder is often quite variable and sensitive to environmental influences.

Dr. First notes that for the past 18 months, in contrast to his life prior to incarceration, Mr. Arbabsiar has been in an isolated setting with minimal exposure to environmental stimuli. It is likely that the severe stress related to impending sentencing hearing served to trigger this brief episode of dysphoric mixed mood, which was severe enough to warrant a call for psychiatric evaluation and subsequent treatment.

## CONCLUSION

While Dr. Chin only provides a diagnosis of "other

4

specified episodic mood disorder," that diagnosis reflects only the psychiatric symptoms manifest at that time and, in any event, fully accords with the mixed hypermanic/depressive states that characterized Mr. Arbabsiar's behavior between the more severe episodes outlined in Dr. First's report.

Certainly, Dr. Chin's report further supports the plainly obvious: at the time of the offense, Mr. Arbabsiar suffered from an untreated severe mental condition that affected his ability to properly weigh the costs and consequences of his offense conduct and materially influenced his decision to continue in the plot at issue.

For these reasons, a sentence of 120 months (ten years) in prison, followed by a period of supervised release, is a appropriate.

Dated:  New York, New York
        May 3, 2013

                        Federal Defenders of New York, Inc.
                        52 Duane Street - 10th Floor
                        New York, New York  10007

                        Attorney for Manssor Arbabsiar

            By:    _____
                        Sabrina P. Shroff, Esq.
                        Colleen P. Cassidy, Esq.

TO:  Edward Kim, Esq.
     Glenn Kopp, Esq.
     Assistant United States Attorneys

                                5

D58UARBH                          First - direct

1    Q.  Could you elaborate on that?

2    A.  Yes.  Bipolar II disorder is a chronic mood disorder that

3    is characterized by episodes of depression, major depressive

4    episodes that are commonly known as clinical depression, as

5    well as hypomanic episodes which are episodes of elevated mood

6    that are persistent, but not so severe as to qualify for

7    diagnosis of mania.

8           So the difference between mania and hypomania, the

9    symptoms are exactly the same.  In fact, if you look at the

10   DSM, it is the same list of seven symptoms.  It is the same

11   requirement, for at least three out of seven.  The only

12   difference is a judgment about the severity.  So people who

13   have mania are people who generally end up in the hospital.  It

14   is the kind of person who runs out in the street naked, feeling

15   that they are a messenger from God and they end up in the

16   hospital.

17          THE COURT:  That is mania.  He doesn't suffer from

18   that?

19          THE WITNESS:  No.

20          THE COURT:  He does not suffer from that?

21          THE WITNESS:  No.  He doesn't.

22          THE COURT:  I wanted to make sure.

23          THE WITNESS:  Hypomania, which looks like mania

24   symptomatically, but it is not as severe.

25          THE COURT:  Wait a minute.  You say hypomania looks

D58UARBH                    First - direct

1   like mania.  And you say mania -- and one illustration you gave

2   is the people who run around the street naked, right?

3           THE WITNESS:  Right.

4           THE COURT:  Do hypomania people run around the streets

5   naked?

6           THE WITNESS:  No, they don't.  Let me explain.

7           THE COURT:  When you say they show the same symptoms,

8   that confuses me.  So that would be a symptom, right?

9           THE WITNESS:  That in not one of the required

10  symptoms.

11          THE COURT:  You used it as an illustration.  I didn't

12  pick it out.

13          THE WITNESS:  That is a classic example of people when

14  you think of mania.  And people getting hospitalized, that is

15  the kind of thing that would get someone in the hospital.

16          MS. SHROFF:  Dr. First, would you slow down, please.

17          THE WITNESS:  Let me give you an example of the seven

18  symptoms that are shared between mania and hypomania.  One of

19  them is decreased need for sleep.  Someone with mania, a

20  classic case of mania, somebody says, you know, I haven't slept

21  in four weeks.  I have had no sleep in four weeks.  Hypomania,

22  is --

23          THE COURT:  Is that possible, physically?

24          THE WITNESS:  It is, believe it or not.

25          THE COURT:  Four weeks without sleep?

D58UARBH                        First - direct

THE WITNESS:  It is.  For hypomania, they will say, I
have only had three hours of sleep.

THE COURT:  In four weeks or in one night?

THE WITNESS:  No.  Every night for four weeks, yeah.

And another symptom would be speaking rapidly.

THE COURT:  You were just asked to slow down --

THE WITNESS:  Right.  I was able to slow down, that's
the difference.  Someone who has mania or hypomania, they speak
rapidly and you cannot get a word in edgewise.  Someone who has
normal rapid speech, when they say please slow down, they
respond to it and they are able to slow down.

THE COURT:  OK.

MS. SHROFF:  Judge, it is too late for a second career
for you now; you have to stick to being a judge.

THE WITNESS:  So each of the seven symptoms, when they
on the milder level, they are considered hypomania and when
they are on the most severe level, the person who -- what is
another word?  The grandiosity is another one.  A person who
believes that they are very smart.  They are unusually
grandiose.  They have crazy plans so that would be hypomania.

THE COURT:  Well, isn't grandiosity an indicia of
paranoia?

THE WITNESS:  No.  Paranoia generally means that you
believe that there is a plot against you.

THE COURT:  I know.  I understand that, but is not a