UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

MANSSOR ARBABSIAR,

                      :    14 Civ. 3222 (JFK)

         Movant,        11 Cr. 897 (JFK)

                      :

    - v. -

                      :

UNITED STATES OF AMERICA,

                      :

         Respondent.

                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S MOTION PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Edward Y. Kim
Assistant United States Attorney
    -Of Counsel-

## I.      PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the *pro se* motion to vacate the sentence of Manssor Arbabsiar ("Arbabsiar" or "defendant") pursuant to Title 28, United States Code, Section 2255.  Arbabsiar, who pleaded guilty pursuant to a plea agreement (the "Plea Agreement") to a three-count superseding information (the "Information"), now seeks collateral relief from his sentence.  Liberally construing the petition, Arbabsiar seeks relief because (1) the Court failed to adequately consider whether Arbabsiar's offense conduct was driven by an altered state of mind; (2) the applicable Guidelines range was miscalculated; and (3) he received ineffective assistance of counsel in connection with his guilty plea and sentencing.  Arbabsiar failed to file a timely notice of appeal from his conviction, but has submitted neither an explanation of such failure, nor a claim of actual innocence.  Moreover, in the Plea Agreement, Arbabsiar waived his right to challenge his sentence under Title 28, United States Code, Section 2255.  Accordingly, his claims are procedurally defaulted.

The petition also fails on its merits.  Contrary to Arbabsiar's arguments, the Court extensively considered arguments about his mental condition during the offense conduct, and the applicable Guidelines range was properly calculated.  Moreover, Arbabsiar's unsupported claims of ineffective assistance are flatly contradicted by the record.  Accordingly, the Government respectfully submits that the petition should be denied in its entirety.

## II.    BACKGROUND

### A.    Offense Conduct[1]

#### 1.    The Plot to Assassinate the Ambassador

The defendant Manssor Arbabsiar, a/k/a "Mansour Arbabsiar," and his Iranian military co-conspirators, including Gholam Shakuri, a member of the Islamic Republic Guards Corps - Qods Force, plotted the murder of the Saudi Arabian Ambassador to the United States (the "Ambassador"). (PSR ¶ 9). In order to ensure the success of this plot, Arbabsiar met on a number of occasions in Mexico with a Drug Enforcement Administration ("DEA") confidential source ("CS-1"). (*Id*.). In the course of these meetings, CS-1 posed as an associate of a sophisticated and violent international drug trafficking cartel. (*Id*.). Arbabsiar arranged to hire CS-1 and his purported criminal associates to murder the Ambassador in Washington, D.C., and Shakuri and other Iranian military co-conspirators were aware of and approved the plan. (*Id*.).

#### 2.    Arbabsiar's Iranian Co-Conspirators

The Iranian Islamic Revolutionary Guard Corps (the "IRGC") is Iran's paramilitary force and answerable to Iran's supreme leader. (PSR ¶ 10). The IRGC is composed of a number of branches, including the Qods Force. (*Id*.). The Qods Force conducts sensitive covert operations outside of Iran, including terrorist attacks, assassinations, and kidnappings, and provides weapons and training to Iran's terrorist and militant allies. (*Id*.). Among many other things, the Qods Force is believed to have sponsored attacks against Coalition Forces in Iraq. (*Id*.). In October 2007, the United States Treasury Department designated the Qods Force as a terrorist supporter, pursuant to Executive Order 13224, for providing material support to the Taliban and other terrorist organizations. (*Id*.).

---

[1] All citations to the Presentence Investigation Report ("PSR") in this section refer to the Offense Conduct section of the PSR.

### 3.   Arbabsiar's Recruitment by His Cousin in Iran

In the early spring of 2011, while Arbabsiar was in Iran visiting his family, his cousin approached him and asked Arbabsiar to work with him. (PSR ¶ 11). Arbabsiar had long understood that his cousin (hereinafter "Iranian Official #1"), was a high-ranking member of the Qods Force. (*Id*.). Arbabsiar told Iranian Official #1 that as a result of his business in both Mexico and the United States, Arbabsiar knew a number of people who traveled between the two countries, and that he believed that some of those people were narcotics traffickers. (*Id*.). Iranian Official #1 told Arbabsiar that he wanted Arbabsiar to hire someone who could kidnap the Ambassador and that Arbabsiar should find someone in the narcotics business, because people in that business are willing to undertake criminal activity in exchange for money. (*Id*.). In addition to the plot to attack the Ambassador, Iranian Official #1 told Arbabsiar that there could be additional assignments following the Ambassador job, including attacks on embassies in the United States and elsewhere. (*Id*.). According to Iranian Official #1, the plot against the Ambassador, however, was the priority mission. (*Id*.).

After Arbabsiar met with Iranian Official #1 and received instructions to kidnap the Ambassador, Iranian Official #1 advised Arbabsiar that he was leaving Iran and would be placing his deputy, co-defendant Gholam Shakuri, in charge of handling Arbabsiar for the mission. (PSR ¶ 12). Thereafter, in Tehran, Arbabsiar met with Shakuri for the first time. Shakuri instructed Arbabsiar to find a person to carry out the plot against the Ambassador and told Arbabsiar that the Qods Force would provide Arbabsiar with anything he needed to accomplish his mission. (*Id*.). About a week after meeting with Shakuri, Arbabsiar left Iran for Texas. (PSR ¶ 13).

#### 4.      May 2011: Arbabsiar's Initial Meeting with CS-1

On May 24, 2011, Arbabsiar traveled from Texas to Mexico and met with CS-1 in Mexico.  (PSR ¶ 14).  Arbabsiar had been looking for someone to carry out the operation against the Ambassador.  He was able to make contact with CS-1 through someone Arbabsiar had known previously in Texas.  During this meeting, and all others with Arbabsiar, CS-1 posed as an associate of a drug-trafficking cartel.  (*Id.*).  Arbabsiar inquired as to CS-1's knowledge of explosives.  (*Id.*).  Arbabsiar explained to CS-1 that he was interested in, among other things, attacking an embassy of Saudi Arabia.  CS-1 responded that he was knowledgeable with respect to C-4 explosives.  (*Id.*).

After Arbabsiar's initial meeting with CS-1, Arbabsiar returned to Texas and then left the United States about a week later.   (PSR ¶ 15).

#### 5.      Arbabsiar Returns to Iran and Meets with Shakuri

Following his return to Iran, Arbabsiar met with Shakuri to report on his meeting with CS-1.  (PSR ¶ 16).  Arbabsiar indicated to Shakuri that he had located a drug dealer in Mexico who could carry out their plan to take action against the Ambassador.  (*Id.*).  Shakuri instructed Arbabsiar to return to Mexico to finalize the deal with CS-1 for the operation involving the Ambassador.  (*Id.*).  Shakuri further advised Arbabsiar to move quickly because the operation needed to be accomplished with haste in order to put pressure on the Saudis.  (*Id.*).  A few weeks later, Arbabsiar again left Iran for Mexico.  (*Id.*).

#### 6.      June and July 2011: Arbabsiar Meets Again with CS-1

On June 23, 2011, Arbabsiar returned to Mexico.  (PSR ¶ 17).  In late June and July, Arbabsiar met again with CS-1 in Mexico.  (*Id.*).  Over the course of a series of meetings, Arbabsiar explained to CS-1 that his military associates in Iran had discussed a number of

violent missions for CS-1 and CS-1's purported criminal associates to perform, including the murder of the Ambassador.   (*Id*.).

On July 14, 2011, Arbabsiar met again with CS-1 in Mexico.  (PSR ¶ 18).  CS-1 recorded the meeting at the direction of the DEA.  (*Id*.).  During this meeting, CS-1 told Arbabsiar that he would need a team of at least four men to assassinate the Ambassador and that the price for conducting the assassination would be $1.5 million.  (*Id*.).  CS-1 and Arbabsiar also discussed the method by which Arbabsiar would pay CS-1.  (*Id*.).  Arbabsiar then said that he had been told that $100,000 was available in Iran to pay CS-1 as a first installment toward the assassination of the Ambassador.  (*Id*.).  During the course of the meeting, Arbabsiar stated that his cousin worked in other countries on behalf of the Iranian government and had requested that Arbabsiar find someone who could carry out the plot to kill the Ambassador.  (*Id*.).

On July 17, 2011, Arbabsiar met again with CS-1 in Mexico.  (PSR ¶ 19).  During the meeting, after Arbabsiar identified a photograph of the Ambassador, CS-1 informed Arbabsiar that one of CS-1's associates had already traveled to Washington, D.C. to surveil the Ambassador.  (*Id*.).  CS-1 asked exactly what Arbabsiar's cousin wanted him to do, and Arbabsiar stated that his cousin wanted CS-1 to kill the Ambassador.  (*Id*.).  Arbabsiar also said that it would be permissible for CS-1 to kill the Ambassador even if it resulted in bystander casualties.  (*Id*.).  CS-1 explained to Arbabsiar, "there's gonna be like American people there . . . in the restaurant. You want me to do it outside or in the restaurant?"  (*Id*.).  Arbabsiar answered: "[d]oesn't matter how you do it. I mean, if you do it by himself, kill is better, but sometime, you know, you have no choice, is that right?"  (*Id*.).  On numerous occasions during the July 17 meeting, Arbabsiar made it clear that the assassination needed to go forward, even if doing so would cause mass casualties.  (*Id*.).  For example, Arbabsiar told CS-1:  "They want that guy [the

5

Ambassador] done [killed], if the hundred go with him, fuck 'em." (*Id*.).  In a similar vein, Arbabsiar and CS-1 also discussed the means by which the Ambassador would be killed.  CS-1 said: "I'm gonna blow him [the Ambassador] up or shoot him, whatever you want."  Arbabsiar responded: "Yeah, it doesn't matter  . . . [w]hatever is easy for . . . how is possible for you." (*Id*.).

Arbabsiar repeatedly reassured CS-1 that CS-1 and CS-1's men would indeed be paid for killing the Ambassador.  (PSR ¶ 20).  Arbabsiar told CS-1 to tell the people working for CS-1 that Arbabsiar could "guarantee the money . . . I [Arbabsiar] got the money coming."  Arbabsiar emphasized that "this is politics, ok . . . it's not like, eh, personal . . . This is politics, so these people [Arbabsiar's co-conspirators in Iran] they pay this government ... he's got [Arbabsiar's cousin has got] the, got the government behind him . . . he's not paying from his pocket."  (*Id*.).  To facilitate payment, at one point during the July 17 meeting, CS-1 gave Arbabsiar "the account number ... in [a U.S. bank] ... and the U.S. routing number" - the unique number associated with the United States bank account into which Arbabsiar could arrange for payment to be made to CS-1 for the assassination of the Ambassador.   (*Id*.).

At the end of the meeting, Arbabsiar reiterated that the potential for civilian casualties should not dissuade CS-1 from killing the Ambassador.  (PSR ¶ 21).  Arbabsiar instructed CS-1 that if CS-1 could not kill the Ambassador when he was outside, by himself, CS-1 should kill the Ambassador while he was in the restaurant:  "[l]et it hit the restaurant.  If, if you can do it outside, do it.  If not, restaurant, hit it, it's ok."  (*Id*.).  In response, CS-1 noted that there were "from a hundred, a hundred and fifty [people in the restaurant]" and "buildings on the sides," and "senators [U.S. Senators who dine there]," all of which Arbabsiar dismissed as "no problem" or "no big deal."  (*Id*.).

On or about July 20, 2011, Arbabsiar left Mexico and returned to Iran. (PSR ¶ 22).

7.    **Arbabsiar Meets with Iranian Military Representatives and Confirms Payments to CS-1**

Upon his return to Iran, Arbabsiar met a number of occasions in Tehran with Shakuri and a third individual, whom Arbabsiar understood was a high-ranking member of the Qods Force (hereinafter "Iranian Official #2"). (PSR ¶ 23). Arbabsiar also met routinely on a one-on-one basis with Shakuri. (*Id.*). During these meetings, the following occurred, among other things:

a. Arbabsiar advised Shakuri and Iranian Official #2 that the plan with regard to the Ambassador was to blow up a restaurant in the United States frequented by the Ambassador and that in light of that plan numerous people, in addition to the Ambassador, could be killed. Arbabsiar's Iranian military co-conspirators approved the plan.

b. Arbabsiar was instructed to use code words when communicating with Shakuri while conducting the operation against the Ambassador. For example, Arbabsiar was instructed to use the code word "Chevrolet" for the Ambassador assassination plot.

c. A down-payment of $100,000 to CS-1 for the murder of the Ambassador was approved.

d. Shakuri advised Arbabsiar that the leader of the Qods Force (hereinafter "Iranian Official #3"), was aware of what Arbabsiar was doing and that Arbabsiar could meet with Iranian Official #3 in the future. (*Id.*).

On August 1, 2011, Arbabsiar caused an overseas wire transfer of $49,960 to be sent through Manhattan to the FBI undercover bank account (the "UC Bank Account") that CS-1 had identified to Arbabsiar. (PSR ¶ 24). On August 6, 2011, Arbabsiar spoke with CS-1 by telephone. (*Id.*). During the conversation, Arbabsiar said that he had sent the other half of the down payment the previous day. (*Id.*). On August 9, 2011, Arbabsiar caused another overseas

wire transfer of $49,960 to be sent through Manhattan to the UC Bank Account.  (*Id*.).  On

August 11, 2011, Arbabsiar spoke with CS-1 on the telephone.  (*Id*.).  During the call, Arbabsiar

asked CS-1 whether he had received the second half of the down payment.  (*Id*.).

### 8.    September 2011: Arbabsiar Returns to Mexico

On September 2, 2011, Arbabsiar spoke with CS-1 on the telephone.  (PSR ¶ 25).  CS-1

recorded the conversation.  (*Id*.).  During the telephone call, Arbabsiar inquired as to whether the

arrangements to kill the Ambassador were still under way.  (*Id*.).  Arbabsiar then explained to

CS-1 that after CS-1 and CS-1's team assassinated the Ambassador, CS-1 would make money

from that and other projects with Arbabsiar and his Iranian military associates.  (*Id*.).  Arbabsiar

stated, "once we do this one, you gonna open a [U/I] like, uh . . . you got the number for the

safe" and "[o]nce you open the door, that's it.  You know what I mean? ... [y]ou don't have to

worry about anything."  (*Id*.).

On September 12, 2011, Arbabsiar spoke with CS-1 on the telephone.  (PSR ¶ 26).

During the telephone call, Arbabsiar advised CS-1 that CS-1 would be paid $1.5 million for the

assassination of the Ambassador, as they had discussed before:  "the number is gonna stay the

same thing [o]ne and a half . . . ."  (*Id*.).  Arbabsiar assured CS-1 that in the future, CS-1 could

prepare for the additional attacks previously discussed between them, but that CS-1 first needed

to assassinate the Ambassador.  (*Id*.).  Arbabsiar also noted that CS-1's first task – the

assassination of the Ambassador – was designed as a test run, with future assignments to follow

from Arbabsiar's Iranian military associates if the assassination was successful ("[t]he first one

they just want it . . . for test").  (*Id*.).

On September 20, 2011, Arbabsiar again spoke with CS-1 over the telephone.  (PSR ¶

27).  During the call, CS-1 stated that he wanted Arbabsiar and his associates to make an

additional payment of half of the total payment for the assassination or for Arbabsiar to personally come to Mexico to serve as collateral for the final payment. (*Id.*). Arbabsiar ultimately agreed to travel to Mexico to guarantee payment for the Ambassador's assassination. (*Id.*).

In late September 2011, Arbabsiar met with Shakuri in Tehran. (PSR ¶ 28). Arbabsiar explained that CS-1 wanted either to receive half of the money previously promised for the completion of the Ambassador murder, or to have Arbabsiar travel back to Mexico as a guarantee of payment. (*Id.*). Shakuri advised Arbabsiar that he and his associates would not give any more money to CS-1 before the Ambassador was assassinated, and warned Arbabsiar against traveling back to Mexico. (*Id.*). Shakuri said that Arbabsiar was responsible for himself if he did travel. (*Id.*). Shakuri then told Arbabsiar that if Arbabsiar did travel to Mexico, he was to get in contact with Shakuri via telephone after his arrival in Mexico so that Shakuri could be sure Arbabsiar was well. (*Id.*).

On September 28, 2011, Arbabsiar flew to Mexico from Iran via Germany. (PSR ¶ 29). Arbabsiar was denied entry into Mexico, and was re-routed back to Germany through John F. Kennedy International Airport ("JFK") on September 29, 2011. (*Id.*). Arbabsiar was arrested after he disembarked from the plane at JFK. (*Id.*). Following his arrest, Arbabsiar made numerous statements to law enforcement, during which he admitted his involvement in the plot.

### B.     Arbabsiar's Conviction

#### 1.     Indictment

On October 20, 2011, a grand jury in this District returned an indictment, 11 Cr. 897 (JFK) (the "Indictment"), against the defendant in five counts. The counts of the Indictment arose from the defendant's agreement with members of the Qods Force to hire an individual

whom the defendant believed to be a member of a violent drug cartel to assassinate the Ambassador in a public area, an act that the defendant and his co-conspirators understood would result in mass casualties.

### 2.    Plea Agreement

On October 18, 2012, the defendant pleaded guilty pursuant to the Plea Agreement to the Information, which charged him with traveling in foreign commerce and using interstate and foreign commerce facilities in the commission of murder-for-hire, and conspiracy to do so, in violation of Title 18, United States Code, Section 1958, and conspiring to commit an offense against the United States, namely, an act of terrorism transcending national boundaries, in violation of Title 18, United States Code, Sections 2332b and 371.

In the Plea Agreement, Arbabsiar admitted that the following facts were true:

> From the Spring of 2011 through the Fall of 2011, Mansoor Arbabsiar and his co-conspirators, officials in the Iranian military who were based in Iran (the "co-conspirators"), agreed to cause the assassination of the Ambassador of Saudi Arabia to the United States (the "Ambassador"), while the Ambassador was in the United States.
>
> Acting at the direction of his co-conspirators and in furtherance of this agreement, Arbabsiar traveled internationally to Mexico on several occasions, including from Iran, in order to arrange the assassination of the Ambassador.  These trips occurred in May, June, July and September of 2011.  In Mexico, Arbabsiar met with a person ("the Individual") who claimed to be a representative of a sophisticated and violent Latin American drug cartel that had access to military-grade weaponry.  With the approval of Arbabsiar's co-conspirators, Arbabsiar arranged to hire the Individual and his criminal associates to murder the Ambassador, while the Ambassador was in the United States.  Arbabsiar agreed to pay $1.5 million to the Individual.
>
> Arbabsiar discussed with the Individual a plan for the Individual and his criminal associates to travel to Washington, D.C. to murder the Ambassador at a restaurant there.  The plan was subsequently approved by Arbabsiar's co-conspirators.

> Arbabsiar then arranged for a $100,000 payment, in two
> installments, to be wired to the Individual at a U.S. bank account,
> as a down-payment for the anticipated murder of the Ambassador.
> Arbabsiar's co-conspirators approved this payment, which was
> made via wire transfers to a U.S. bank account that passed through
> Manhattan, New York.

(Plea Agreement, attached as Exhibit A, at 7).

In the Plea Agreement, the parties stipulated in relevant part that the base offense level applicable to Count Three was 43.  (*Id.*).  The parties further stipulated that the offense level was increased by 12 levels because the offense was a felony that involved, or was intended to promote, a federal crime of terrorism.  (*Id.*).  The parties also stipulated that a three level reduction was appropriate because of the defendant's acceptance of responsibility.  (*Id.*).  Accordingly, the total offense level set forth in the Plea Agreement was 52.  Based on a criminal history category of VI, the parties agreed that the Stipulated Guidelines Sentence was 300 months, which also was the total statutory maximum sentence.  (*Id.* at 5).

In the Plea Agreement, the defendant agreed not to challenge any sentence below the Stipulated Guidelines Sentence of 300 months' imprisonment.  The Plea Agreement provided, in relevant part:

> It is agreed (i) that the defendant will not file a direct appeal; **nor
> bring a collateral challenge, including but not limited to an
> application under Title 28, United States Code, Section 2255**
> and/or Section 2241; nor seek a sentence modification pursuant to
> Title 18, United States Code, Section 3582(c), **of any sentence at
> or below the Stipulated Guidelines Sentence of 300 months'
> imprisonment,** and (ii) that the Government will not appeal any
> sentence at the Stipulated Guidelines Sentence.  This provision is
> binding on the parties even if the Court employs a Guidelines
> analysis different from that stipulated to herein.

(*Id.* at 6) (emphases added).

### 3.      Guilty Plea

During his plea, the defendant admitted, among other things, that he had agreed with officials in the Iranian military to cause the assassination of the Ambassador while the Ambassador was in the United States.  (October 18, 2012 Plea Transcript, attached as Exhibit B, at 18).  Arbabsiar also admitted that he had agreed to pay $1.5 million to an individual (CS-1) in order to murder the Ambassador.  (*Id.* at 19).  Arbabsiar further acknowledged that he had arranged for $100,000 to be wired to CS-1 as a down payment for the murder.  (*Id.* at 20).

Before accepting the defendant's guilty plea, Your Honor conducted a thorough proceeding that complied fully with Rule 11 of the Federal Rules of Criminal Procedure.  To start the proceeding, Arbabsiar was placed under oath.  (*Id.* at 2-3).  Your Honor then engaged in a thorough colloquy to confirm that Arbabsiar was competent to enter a plea of guilty.  (*Id.* at 3-5).  The Court then explained the rights that the defendant had under the Constitution and laws of the United States, which the defendant would be waiving by pleading guilty.  (*Id.* at 7-9).  Arbabsiar indicated that he understood each of these rights, and that he was giving up these rights by pleading guilty.  (*Id.*).

Your Honor explicitly confirmed Arbabsiar's actual guilt:

> THE COURT: Now, are you accepting this [plea] agreement because you are really guilty?
>
> THE DEFENDANT: Yeah, I'm guilty.

(*Id.* at 17).

Your Honor also confirmed that the defendant understood the terms of the Plea Agreement.  (*Id.* at 10-20).  In particular, Your Honor confirmed that the defendant understood that the Stipulated Guidelines Sentence was 300 months' imprisonment:

> THE COURT: And all that means is this:  That you face a total
> statutory maximum sentence—I told you this already—of 25 years,
> and the applicable guidelines is the same thing, 25 years or 300
> months.  Do you understand that?
>
> THE DEFENDANT: Yes, your Honor.

(*Id.* at 14).

Your Honor then explicitly confirmed that the defendant understood that under the Plea

Agreement, he was waiving the right to appeal or collaterally attack any sentence within or

below the Stipulated Guidelines Sentence:

> THE COURT:  Now, the next paragraph points out that you are not
> going to file a direct appeal nor bring what is called a habeas
> corpus application or any other effort to set aside your plea or seek
> a sentence modification of any sentence within or below the
> guideline range.  Do you understand that?
>
> THE DEFENDANT: Yes, Judge.

(*Id.* at 16).

### C.     Sentencing

In connection with sentencing, the Court held a *Fatico* hearing on May 8, 2013 and May

29, 2013.  (May 30, 2013 Sentencing Transcript, attached as Exhibit C, at 13).  During the course

of the hearing, the Court considered testimony from a defense witness, Dr. Michael First a

Professor of Clinical Psychiatry, and two Government witnesses, Dr. Elissa Miller, the Chief

Psychologist at the Metropolitan Correctional Center, and Dr. Gregory Saathoff, a psychiatrist.

(*Id.*).

Arbabsiar was sentenced by the Court on May 30, 2013.  Prior to pronouncing sentence,

Your Honor confirmed that Arbabsiar had reviewed the Presentence Report with his attorney and

had no objections to it.  (*Id.* at 3).  The Court also calculated the applicable Guidelines range, and

agreed with the parties and the Probation Department, that the recommended Guidelines sentence was 300 months.  (*Id.* at 11).

Your Honor then discussed the testimony heard by the Court during the *Fatico* hearing and stated that the testimony of the Government's expert witness, Dr. Saathoff, was "more convincing" than the testimony offered by the defense expert, Dr. First.  (*Id.* at 14).  The Court also noted that Dr. First's diagnosis of Arbabsiar had changed over time and that Dr. First had concluded that Arbabsiar was mentally competent to stand trial and knew right from wrong.  (*Id.* at 14).  Your Honor then sentenced Arbabsiar to the recommended Guidelines sentence of 25 years' imprisonment.  (*Id.* at 15).

### D.    Arbabsiar's Motion Pursuant to Section 2255

On April 28, 2014, without having previously filed a notice of appeal, Arbabsiar filed the instant motion pursuant to Title 28, United States Code, Section 2255.  He seeks to vacate his Guidelines sentence based on his claims that (1) the Court failed to adequately consider whether Arbabsiar's offense conduct was driven by an altered state of mind; (2) the applicable Guidelines range was miscalculated; and (3) he received ineffective assistance of counsel in connection with his guilty plea and sentencing.

### III.    ARGUMENT

Arbabsiar procedurally defaulted on all of his claims by failing to file a direct appeal from his conviction and under the terms of the Plea Agreement.  Moreover, to the extent this Court considers the merits of Arbabsiar's arguments, they are unpersuasive, particularly considering the heavy burden a petitioner faces in seeking collateral relief pursuant to Section 2255.  *See generally Cuoco* v. *United States*, 208 F.3d 27, 30 (2d Cir. 2000).

## A.      Arbabsiar's Arguments Are Procedurally Barred

Arbabsiar's arguments are procedurally barred for two reasons.  First, Arbabsiar failed to file a direct appeal.  Second, Arbabsiar signed a plea agreement in which he waived the right to bring the instant motion.

### 1.      Failure to File Direct Appeal

Arbabsiar failed to file a direct appeal from his conviction, choosing instead to proceed directly to a petition under Title 28, United States Code, Section 2255.  But as the Second Circuit has observed, a petition pursuant to Section 2255 "is not a substitute for direct appeal."  *Sapia* v. *United States*, 433 F.3d 212, 217 (2d Cir. 2005).  Indeed, aside from claims of ineffective assistance of counsel, "claims not raised on direct appeal may not be raised on collateral review." *Massaro* v. *United States*, 538 U.S. 500, 504 (2003).  Accordingly, aside from his claim that he received ineffective assistance in connection with his guilty plea, Arbabsiar has procedurally defaulted on the issues raised in his brief unless he can show "(1) cause for failing to raise the issue, and prejudice resulting therefrom; or (2) actual innocence."  *Sapia*, 433 F.3d at 217 (quoting *Rosario* v. *United States*, 164 F.3d 729, 732 (2d Cir. 1998)).  Arbabsiar has done neither.

The Second Circuit has explained that "cause" under the "cause and prejudice test must be something *external* to the petitioner, something that cannot be fairly attributed to him." *Marone* v. *United States*, 10 F.3d 65, 67 (2d Cir. 1993) (citing *Coleman* v. *Thompson*, 501 U.S. 722 (1991)) (emphasis in original); *accord United States* v. *Pipitone*, 67 F.3d 24, 38 (2d Cir. 1995) (same).  Having provided no explanation for his failure to file an appeal, Arbabsiar plainly cannot show "cause."  Meanwhile, "[f]or a prejudice inquiry in a case such as this, the question is whether, but for the lapse, there is a reasonable probability the sentence would have been the

same." *Sapia*, 433 F.3d at 218 (quoting *Johnson* v. *United States*, 313 F.3d 815, 818 (2d Cir. 2002). But, as discussed below, Arbabsiar's arguments are wholly without merit and would not reasonably have met with success on direct appeal. Finally, Arbabsiar cannot reasonably claim innocence, having conceded his guilt upon entering his guilty plea. Accordingly, aside from his ineffective assistance claims, Arbabsiar is procedurally barred from raising his arguments pursuant to Section 2255.

### 2.   Plea Agreement Waiver

All of Arbabsiar's claims are procedurally barred for an independent reason. Specifically, Arbabsiar's motion should be denied because in the Plea Agreement, Arbabsiar expressly waived his right to appeal or collaterally attack a stipulated Guidelines sentence of 300 months or less. Arbabsiar knowingly and voluntarily pleaded guilty pursuant to the Plea Agreement and received a Guidelines sentence of 300 months' imprisonment. Arbabsiar therefore waived his right to bring the instant motion.

The Second Circuit has repeatedly held that waivers of the right to appeal and collaterally attack sentences are typically valid and enforceable. *See United States* v. *Lee*, 523 F.3d 104, 106 (2d Cir. 2008); *Garcia-Santos* v. *United States*, 273 F.3d 506, 509 (2d Cir. 2001) (per curiam); *United States* v. *Roque*, 421 F.3d 118, 124 (2d Cir. 2005); *United States* v. *Haynes*, 412 F.3d 37, 39 (2d Cir. 2005) (per curiam); *United States* v. *Morgan*, 406 F.3d 135, 137 (2d Cir. 2005); *United States* v. *Fisher*, 232 F.3d 301, 303 (2d Cir. 2000); *United States* v. *Gomez-Perez*, 215 F.3d 315, 318 (2d Cir. 2000); *United States* v. *Difeaux*, 163 F.3d 725, 728 (2d Cir. 1998); *United States* v. *Djelevic*, 161 F.3d 104, 106-07 (2d Cir. 1998) (per curiam); *United States* v. *Maher*, 108 F.3d 1513, 1531 (2d Cir. 1997).

Thus, where a defendant has knowingly and voluntarily waived his right to appeal or collaterally challenge a sentence within a stipulated Guidelines range, he may not subsequently challenge a sentence imposed within that range.  *See, e.g.*, *United States* v. *Yemitan*, 70 F.3d 746, 747-48 (2d Cir. 1995) (dismissing appeal of a sentence within a stipulated Guidelines range where the appeal was foreclosed by defendant's plea agreement, because "[o]nly the dismissal of this appeal will afford the prosecution the benefit of its bargain"); *United States* v. *Salcido-Contreras*, 990 F.2d 51, 52 (2d Cir. 1993) (per curiam) (dismissing appeal of sentence within stipulated Guidelines range where appeal was foreclosed by defendant's plea agreement); *Garcia-Santos*, 273 F.3d at 509 (affirming district court application of waiver to Section 2255 petition).  As the Second Circuit stated in *Salcido-Contreras*:

> In no circumstance . . . may a defendant, who has secured the benefits of a plea agreement and knowingly and voluntarily waived the right to appeal a certain sentence, then appeal the merits of a sentence conforming to the agreement.  Such a remedy would render the plea bargaining process and the resulting agreement meaningless.

990 F.2d at 53.

The circumstances under which a court will decline to enforce a waiver are very limited.  *See United States* v. *Gomez-Perez*, 215 F.3d at 319 ("The[ ] exceptions to the presumption of the enforceability of a waiver . . . occupy a very circumscribed area of our jurisprudence. Accordingly, we have upheld waiver provisions even in circumstances where the sentence was conceivably imposed in an illegal fashion or in violation of the Guidelines, but yet was still within the range contemplated in the plea agreement.").  As the Second Circuit noted in *Gomez-Perez*, the exceptions include situations

> when the waiver was not made knowingly, voluntarily, and competently, when the sentence was imposed based on constitutionally impermissible factors, such as ethnic, racial or

17

> other prohibited biases, when the government breached the plea
> agreement, or when the sentencing court failed to enunciate any
> rationale for the defendant's sentence . . . .

21 F.3d at 319 (citations omitted); *United States* v. *Djelevic*, 161 F.3d at 106-07 (waiver of

appeal must be knowing and voluntary); *United States* v. *Jacobson*, 15 F.3d 19, 22-23 (2d Cir.

1994) ("Although an agreement not to appeal a sentence within the agreed Guidelines range is

enforceable, we see nothing in such an agreement that waives the right to appeal from an

arguably unconstitutional use of naturalized status as the basis for a sentence." (citations

omitted)).  None of these limited exceptions applies here.

Arbabsiar makes an unsworn and unsupported allegation that he received ineffective

assistance of counsel in connection with the negotiation of his plea.  (Petition at 5).  While this

allegation appears to relate to the calculation of the applicable Guidelines range, construed

liberally it can also be read to implicate the voluntariness of his waiver.  To the extent Arbabsiar

is arguing that his plea was not knowing and voluntary, the record does not support his claim.

Rather, the record unequivocally demonstrates that Arbabsiar knowingly and voluntarily

waived his right to challenge his 300 month sentence under Section 2255.  During the plea

allocution, the Court described the appellate waiver in the Plea Agreement and confirmed that

Arbabsiar understood its significance.  Arbabsiar unambiguously expressed his understanding

that any legal challenge to a sentence of 300 months or less would be foreclosed.  (*Id.* at 14, 16).

In short, there can be no dispute that Arbabsiar knowingly and voluntarily waived his

right to collaterally challenge the sentence he received.  Arbabsiar's unsworn and unsupported

claim, which is contradicted by his sworn statements under oath, can be rejected.  *See United

States* v. *Cabrera*, ___ Fed. Appx. ___, 2014 WL 1705269, at *1 (2d Cir. May 1, 2014) ("A

defendant's statements during the plea colloquy are not to be taken lightly because '[s]olemn

declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.'") (quoting *Blackledge* v. *Allison*, 431 U.S. 63, 74 (1977)).  Accordingly, Arbabsiar's claims should be dismissed based on the enforceable waiver contained in the Plea Agreement.

**B.**      **Arbabsiar's Arguments Are Meritless**

Arbabsiar's claims are not only procedurally barred.  They are also completely meritless. As set forth below, the Court adequately considered the issue of Arbabsiar's mental state. Moreover, the applicable Guidelines sentence was properly calculated, and Arbabsiar did not receive ineffective assistance in connection with his plea or sentencing.

**1.**      **The Court Considered and Rejected Defense Arguments Related to Arbabsiar' Mental State During the Commission of the Offense**

Arbabsiar first argues that the Court did not adequately consider the claim that his offense was driven by his mental state.  Arbabsiar's baseless claim is belied by the record.  The Court in fact held a *Fatico* hearing over two days to address that precise issue.  During that hearing, the Court considered the testimony of a defense expert witness, Dr. First, and two Government witnesses, Dr. Saathoff and Dr. Miller.  The Court also considered a report prepared by Dr. First, who opined that Arbabsiar suffered from bipolar II disorder and was suffering from a manic episode during the timeframe of the offense.  (Exhibit C at 13).

During the sentencing proceeding, the Court explicitly found that Dr. Saathoff's conclusion that Arbabsiar was not suffering from bipolar disorder was more convincing.  (*Id.* at 14).  The Court noted that Dr. First had conceded that Arbabsiar's supposed hypomanic episode did not persist continuously throughout the life of the conspiracy and that his diagnosis had also

changed over time from bipolar I to bipolar II.  (*Id.*).  The Court also noted that even in Dr. First's view, Arbabsiar knew right from wrong.  (*Id.*).

In short, the record overwhelmingly demonstrates the Court's careful consideration of the defendant's mental state at the time of the offense.

### 2.     The Applicable Guidelines Sentence Was Properly Calculated

Arbabsiar makes a number of arguments related to the calculation of the relevant Guidelines.  Arbabsiar first claims that he never agreed that he had participated in a conspiracy to commit murder (as charged in Count Two) and that his base offense level was therefore improperly calculated as 33.  (Petition at 3).  As an initial matter, the applicable Guidelines sentence was driven not by Count Two but by Count Three, which contained the highest offense level of the counts in the Information.  (Exhibit A at 4).  In any event, the premise of Arbabsiar's claim is contradicted by both the Plea Agreement and his statements during the plea, in which he admitted that he and co-conspirators agreed to cause the assassination of the Ambassador. (Exhibit A at 7; Exhibit B at 18).

Arbabsiar also claims that he never admitted to receiving something of pecuniary value in connection with his participation in the offense and that the four level increase in the offense level for Count One was therefore improper.  (Petition at 3).  As set forth above, the applicable Guidelines sentence was driven not by Count One but by Count Three.  (Exhibit A at 4). Regardless, the four level increase in the offense level, which does not require that Arbabsiar himself receive anything of pecuniary value, *see* U.S.S.G. § 2A1.5(b)(1), clearly applies in light of Arbabsiar's admission that Arbabsiar agreed to pay $1.5 million to another individual to kill the Ambassador.  (*Id.* at 7).

Arbabsiar also claims that the terrorism enhancement, under Section 3A1.4 of the Guidelines, was improperly applied because he never admitted to any "terroristic acts." (Petition at 3). However, Arbabsiar pled guilty to conspiring to commit an offense against the United States, specifically, an act of terrorism transcending national boundaries. (Exhibit A at 1). This crime qualifies as "a federal crime of terrorism" under Section 3A1.4(a) of the Guidelines. *See* U.S.S.G. § 3A1.4 Application Note 1; 18 U.S.C. § 2332b(g)(5).

Arbabsiar also argues that he never admitted to conduct contained in Count Three, which charged him with conspiring to kill or maim people within the United States or to create a substantial risk of serious bodily injury to others by destroying or damaging structures or property within the U.S, in violation of Title18, United States Code, Sections 371 and 2332b. (Petition at 3). This claim is contradicted by his admission that he agreed with others to assassinate the Ambassador at a restaurant in the United States. (Exhibit A at 7; Exhibit B at 18).

Finally, Arbabsiar erroneously argues that he did not receive a three level reduction based on his acceptance of responsibility. (Petition at 3-4). In fact, the three level reduction was applied at sentencing. (Exhibit A at 4; Exhibit C at 11).

Accordingly, all of Arbabsiar's related to the calculation of the Guidelines are meritless.

### 3.     Arbabsiar Did Not Receive Ineffective Assistance

A defendant claiming ineffective assistance of counsel must: (1) demonstrate that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms"; and (2) "affirmatively prove prejudice" from counsel's allegedly defective performance. *Strickland* v. *Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *see also Hernandez* v. *United States*, 202 F.3d 486, 488 (2d Cir. 2000) ("Under the *Strickland* standard, a petitioner must establish both (1) that counsel made errors so serious that defendant was deprived

of reasonably competent representation and (2) that counsel's deficient performance prejudiced the defense."); *Hernandez* v. *United States*, 280 F. Supp. 2d 118, 122 (S.D.N.Y. 2003) (noting that a claim that a guilty plea was involuntary because of ineffective assistance of counsel should be evaluated under the *Strickland* test). Only if both of these elements are satisfied can a defendant demonstrate that his counsel made errors "so serious" that "counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and that the defendant was, as a result, deprived of a fair proceeding. *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* test, a reviewing court "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that '[t]here are countless ways to provide effective assistance in any given case' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'" *United States* v. *Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quoting *Strickland*, 466 U.S. at 689). Thus, the ineffectiveness inquiry should focus on "the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. The emphasis should not be on grading counsel's performance, but on "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.*

Even if an attorney's performance was objectively unreasonable and unprofessional, the defendant also must prove prejudice. The reviewing court must assess "whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." *Mayo* v. *Henderson*, 13 F.3d 528, 534 (2d Cir. 1994). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). Moreover, "an analysis focusing solely on mere

22

outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart* v. *Fretwell*, 506 U.S. 364, 369, 372 (1993) ("[T]he 'prejudice' component of the *Strickland* test . . . focuses on the question whether counsel's deficient performance renders the result of the [proceeding] unreliable or the proceeding fundamentally unfair.").

Arbabsiar's claim that he received ineffective assistance in connection with his sentencing and, in part, his plea, appears to be premised on his argument that the Guidelines were improperly calculated.  However, for the reasons set forth above, the applicable Guidelines were properly calculated.  Arbabsiar also makes the general assertion that his counsel was ineffective in negotiating the "plea and waiver."  (Petition at 5).  Arbabsiar's blanket claim is unsupported by any more specific allegations.  More importantly, his unsupported claim is contradicted by his sworn statement during his plea, in which he stated that he was satisfied with his attorney's representation of him.  (Exhibit B at 9).[2]

Accordingly, Arbabsiar fails to establish that his counsel's performance in connection with his plea and sentencing was unreasonable.  Arbabsiar also has not demonstrated any prejudice.  Therefore, his ineffective assistance claims are also meritless.

---

[2] Arbabsiar also notes that he was given only a day to decide whether he would accept the Plea Agreement.  (Petition at 1).  Construing this liberally as support for his ineffective assistance claim, it is nonetheless meritless.  Even assuming the truth of Arbabsiar's assertion, such conduct would not be objectively unreasonable.  Nor could Arbabsiar demonstrate any prejudice.

## IV.     CONCLUSION

For all of the foregoing reasons, Arbabsiar's motion under Title 28, United States Code,

Section 2255 should be denied.

Dated:  New York, New York
        July 11, 2014

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


                                        By: _____/s/_____
                                            Edward Y. Kim
                                            Assistant United States Attorney
                                            (212) 637-2401

24

## AFFIRMATION OF SERVICE

EDWARD Y. KIM, pursuant to Title 28, United States Code, Section 1746, hereby

declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States Attorney

for the Southern District of New York.  That, on July 10, 2014, I caused copies of the

Government's Memorandum of Law to be delivered by certified mail to:

> Manssor Arbabsiar
> # 65807-054
> USP Marion
> U.S. Penitentiary
> P.O. Box 1000
> Marion, IL 62959

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: New York, New York
July 11, 2014

_____/s/_____
Edward Y. Kim
Assistant United States Attorney
(212) 637-2401